THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MISSION SPECIALTY PHARMACY, LLC, | § | NO. SA-15-CV-885-DAE |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| OPTUMRX, INC., | § | |
| | § | |
| | § | |
| Defendant. | § | |
| | § | |

## ORDER DENYING MISSION SPECIALTY'S MOTION FOR PRELIMINARY INJUNCTION

On December 11, 2015, the Court heard oral argument on Mission Specialty Pharmacy's ("Mission Pharmacy" or "Plaintiff") Motion for Preliminary Injunction.  (Dkt. # 8.)  Micah Skidmore, Esq., appeared on behalf of Plaintiff; JoAnn Dalrymple, Esq., appeared on behalf of Defendant OptumRx, Inc. ("OptumRx" or "Defendant").  After careful consideration of the memoranda in support of and in opposition to the motion, and in light of the parties' arguments at the hearing, the Court, for the reasons that follow, **DENIES** Plaintiff's Motion for Preliminary Injunction.  (Dkt. # 8).

FACTS

Mission Pharmacy is an independent retail pharmacy in San Antonio which provides both conventional and compounded prescription medications to patients.  ("Am. Compl.," Dkt. # 25 ¶ 9; Dkt. # 8 ¶¶ 1–2.)  According to Mission Pharmacy, compounded pharmaceuticals are different from conventional prescription medications because they can be customized to meet specific patients' needs.  (Am. Compl. ¶ 9; "Hall Aff.," Dkt. # 8, Ex. B ¶ 10.)  Mission Pharmacy currently offers walk-in prescription services to patients, but also ships compounded medication to patients via Federal Express.  (Am. Compl. ¶¶ 10; 17.)  Mission Pharmacy states that it complies with applicable licensing requirements in each state where it ships covered prescriptions.  (Id. ¶ 17.)

OptumRx is a pharmacy benefit manager.  (Am. Compl. ¶ 11; Dkt. # 15 at 2.)  On August 29, 2012, OptumRx entered into a Pharmacy Network Agreement (the "Agreement") with Morris & Dickson Co. LLC d/b/a Community Independent Pharmacy Network ("CIPN").  (Am. Compl. ¶ 12.)  Mission Pharmacy joined the CIPN and became party to the Agreement on July 9, 2013.  (Id.)  The Agreement requires OptumRx to pay Mission Pharmacy for covered pharmaceuticals it dispenses to OptumRx patients.  (Id. ¶ 13.)

The Agreement between OptumRx and CIPN, to which Mission Pharmacy became a party in 2013, contains the following provision:

> <u>No Mail Fulfillment or Solicitation</u>.  Company and Pharmacy shall
> not solicit a Member for mail delivery or deliver any Covered
> Prescription Services to a Member by mail, except upon the advance
> written approval of Administrator, which approval may be refused in
> Administrator's sole discretion.

(Am. Compl. ¶ 14; "Agreement," Dkt. # 15, Ex. A-2 § 3-10.)  The original

Agreement did not define the word "mail."  (Am. Compl. ¶ 15.)  The 2014

Pharmacy Manual also does not define the word "mail."  (<u>Id.</u> ¶ 18; Dkt. # 8, Ex. C-

2.)

   The Agreement also contains a provision incorporating the "rules,

policies, administrative procedures and guidelines" located in OptumRx's

Pharmacy Manual into the Agreement; this provision notifies Members that these

rules "may change from time to time."  (Agreement § 3.15.)  The Agreement also

contains provisions describing the manner in which the contract or materials

incorporated by reference may be modified.  (<u>Id.</u> § 11.2.)  One such method allows

OptumRx to unilaterally amend the Agreement and incorporate material if it

provides "thirty (30) days prior written notice to Company" before such change.

(<u>Id.</u> at § 11.2(b).)  The contract modification provision states that "[i]f Company

does not object to such amendment in writing within such thirty (30) day notice

period, Company and Pharmacy shall be deemed to have accepted the proposed

amendment."  (<u>Id.</u>)

OptumRx claims that on December 1, 2014, it published notice via e-mail that its 2015 Pharmacy Manual was available for viewing, and would become effective January 1, 2015.  (Dkt. # 15, Ex. A-3.)   Mission Pharmacy did not submit written objections to the changes in the Manual.  (Dkt. # 8; Dkt. # 15.)  The 2015 Pharmacy Manual defines "mail/mailing" as the "action or process of sending Covered Prescription Services through the US mail, shipping via any common carrier (*e.g.* FedEx, UPS, DHL) or via delivery by any type of courier to Members."  (Am. Compl. ¶ 18; Dkt. # 8, Ex. C-3 at 14.)  Mission Pharmacy alleges that OptumRx did not obtain Mission Pharmacy's consent to add this definition of mail; further, Mission Pharmacy states that OptumRx did not provide any consideration for this change to the manual.  (Am. Compl. ¶ 21.)

On June 2, 2015, OptumRx issued a letter to Mission Pharmacy and all other pharmacies contracting through CIPN explaining that OptumRx was terminating the Agreement with CIPN, and inviting Mission Pharmacy and other independent pharmacies "to contract directly with OptumRx."  (Am. Compl. ¶ 22; Dkt. # 8, Ex. C-4.)  Mission Pharmacy's Amended Complaint challenges the validity of the termination, and seeks a declaration that such termination "violates article 21.52B of the Texas Insurance Code.  (Am. Compl. ¶¶ 36, 39(c).)

On August 31, 2015, OptumRx issued a Cease and Desist Letter (the "Letter") demanding that Mission Pharmacy cease "mailing, shipping, and/or

delivering" Covered Prescription Services to members."  (Am. Compl. ¶ 23; Dkt. # 8, Ex. C-5.)  The Letter requests that Mission Pharmacy submit written confirmation that it will cease shipping prescriptions, and states that failure to respond "could result in further disciplinary action, up to and including suspension of payment and termination" from the OptumRx Pharmacy Network.  (Am. Compl. ¶ 23; Dkt. # 8, Ex. C-5.)  Mission Pharmacy continued to ship prescriptions.  (Am. Compl. ¶ 24.)  On September 14, 2015, Mission Pharmacy notified OptumRx via letter that OptumRx's "attempt to limit the shipment of Covered Prescription Services by Mission through a private carrier service is unenforceable."  (Dkt. # 8, Ex. C-6 at 2.)  Further, Mission Pharmacy stated that it would not "agree to cease and desist delivery of Covered Prescription Services by third-party, non-governmental carriers," arguing that such delivery "is not prohibited by the Agreement and is necessary to serve the needs of patients."  (Id. at 3.)

On October 22, 2015, OptumRx sent an e-mail to Mission Pharmacy stating that OptumRx would not "take any action to terminate Mission Pharmacy's status as a participating pharmacy . . . on the basis of Mission Pharmacy's non-participation status or prohibition against mailing before the earlier of December 31, 2015 or when the court rules on the application for preliminary injunction."  (Dkt. # 8, Ex. D-2.)

On October 6, 2015, Mission Pharmacy filed suit in the 150th Judicial District Court of Bexar County, Texas seeking a Temporary Restraining Order (Dkt. # 1, Ex. A ¶¶ 32–46), as well as Temporary and Permanent Injunctions preventing OptumRx from terminating Mission Pharmacy from the pharmacy network for shipping prescriptions through the mail.  (Id. ¶¶ 47–49.)  On October 14, 2015, OptumRx removed the case to this Court on the basis of diversity.  (Id.)  On November 2, 2015, Mission Pharmacy filed the instant Motion for Preliminary Injunction.  (Dkt. # 8.)  On December 10, 2015, Plaintiff filed an amended complaint adding a cause of action for specific performance, which mooted the instant Motion for Preliminary Injunction.  (Dkt. # 25.)  Nonetheless, the parties agreed to conduct the December 11, 2015 preliminary injunction hearing and remedy the procedural issue by filing supplemental responses to the Motion for Preliminary Injunction.  (Dkt. # 27.)   On December 17, 2015, OptumRx filed its Supplemental Response to Plaintiff's Motion for Preliminary Injunction.  (Dkt. # 28.)  Mission Pharmacy filed a Response on December 18, 2015.  (Dkt. # 30.)

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must demonstrate:

(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not granted, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

Janvey v. Alguire, 647 F.3d 585, 595 (5th Cir. 2011); Byrum v. Landreth, 566 F.3d 442, 446 (5th Cir. 2009).  Injunctive relief "should only be granted when the movant has clearly carried the burden of persuasion" on all four requirements. Anderson v. Jackson, 556 F.3d 351, 360 (5th Cir. 2009) (citing Holland Am. Ins. Co. v. Succession of Roy, 777 F.2d 992, 997 (5th Cir. 1985)); Dennis Melancon, Inc. v. City of New Orleans, 703 F.3d 262, 268 (5th Cir. 2012).  "A preliminary injunction is an extraordinary remedy never awarded as of right," and "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (quoting Amoco Prod. Co. v. Village of Gambell, AK, 480 U.S. 531, 542 (1987)).

ANALYSIS

I.  Choice of Law Analysis

    This Court applies Texas choice-of-law rules in determining whether California or Texas law applies to the instant motion.  Nat'l Union Fire Ins. Co. of Pitts., Pa. v. Am. Eurocopter Corp., 692 F.3d 405, 408 (5th Cir. 2012) ("[I]n diversity cases, the federal courts must follow conflict of law rules prevailing in the states in which they sit.") (quoting Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941); see also Benchmark Elec., Inc. v. J.M. Huber Corp., 343 F.3d 719, 726 (5th Cir. 2003).  Where parties have contractually agreed to a choice-of-

law provision, Texas choice-of-law rules favor enforcement of these provisions,

unless the provision "violates a fundamental public policy of Texas." Smith v.

EMC Corp., 393 F.3d 590, 597 (5th Cir. 2004) ("In Texas, contractual choice-of-

law provisions are typically enforced.").  Parties "cannot by agreement thwart or

offend the public policy of the state the law of which ought otherwise to apply."

Int'l Interests, L.P. v. Hardy, 448 F.3d 303, 306–07 (5th Cir. 2006) (quoting

DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 677 (Tex. 1990)).

        Choice of law provisions do not apply to claims other than those

involving the agreement itself.  Benchmark Elec., 343 F.3d at 727 (finding choice-

of-law provisions "appl[y] only to the interpretation and enforcement of the

contractual agreement," and do not "encompass all disputes between the parties")

(quoting Stier v. Reading & Bates Corp., 992 S.W.2d 423, 433 (Tex. 1999)).

Accordingly, Texas law applies to claims unrelated to the contract itself.  EMC

Corp., 393 F.3d at 597 (finding claims not related to the contract are, in a diversity

case, "governed by the forum state's law").

        Here, the Agreement entered into between CIPN and OptumRx

contains two relevant clauses.  First, the contract states that the "Agreement and

the rights and obligations of the parties hereunder shall be governed by and

construed in accordance with the laws of California, without giving effect to the

conflict of law principles thereof."  (Agreement § 11.11.)  Further, the contract

8

states that "any provisions now or hereafter required to be included . . . by applicable laws and regulations or any other Government Authority of competent jurisdiction over the subject matter hereof . . . shall be binding upon and enforceable against the parties hereto and deemed incorporated herein." (Id. at Commercial Addendum § 6.)  These contractual choice-of-law provisions, taken together, do not violate Texas public policy and should be enforced.  The Court will evaluate Mission Pharmacy's breach of contract claims by applying California state law.

Mission Pharmacy pled a cause of action based upon the Texas Insurance Code, which sets forth requirements for health insurance policies wishing to contract with pharmacies in the state of Texas.  To ignore the Texas Insurance Code could well violate Texas public policy; further, the Agreement, insofar as it permits "applicable laws and regulations . . . of competent jurisdiction over the subject matter hereof" to be "binding upon and enforceable against the parties hereto" permits application of the Texas Insurance Code to contract interpretation.  (Id.)  Accordingly, this Court will apply the Texas Insurance Code to the contract to consider Mission Pharmacy's Texas Insurance Code claim.

II. <u>Preliminary Injunction Analysis</u>

  A. <u>Likelihood of Success</u>

       "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits." <u>Winter</u>, 555 U.S. at 20.  In order to prevail on a motion for preliminary injunction, a "plaintiff must present a prima facie case but need not show that he is certain to win" on the merits at summary judgment. <u>Janvey</u>, 647 F.3d at 596; <u>see also</u> <u>Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.</u>, 710 F.3d 579, 582 (5th Cir. 2013).  "It will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." <u>Allied Home Mortg. Corp. v. Donovan</u>, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011) (quoting <u>Sebastian v. Tex. Dep't of Corr.</u>, 830 F.Supp. 2d 223, 227 (S.D. Tex. 1982).  To assess the likelihood of success on the merits, a court looks to "standards provided by the substantive law." <u>Janvey</u>, 647 F.3d at 596 (quoting <u>Roho, Inc. v. Marquis</u>, 902 F.2d 356, 358 (5th Cir. 1990).  Where a plaintiff cannot establish a likelihood of success on the merits, the court may deny plaintiff's application for a preliminary injunction and decline to address the remaining factors.  <u>See</u> <u>Trottie v. Livingston</u>, 766 F. 3d 450, 453 (5th Cir. 2014); <u>Anderson v. Jackson</u>, 556 F.3d 351, 360 (5th Cr. 2009).

Mission Pharmacy raises three separate causes of action in its Motion for Preliminary Injunction: (1) that OptumRx will breach the contract between Mission Pharmacy and OptumRx if it is permitted to terminate the Agreement for the reasons set forth in the Letter (Dkt. # 8 at 8–9); (2) that OptumRx violated California law when it entered the amendment to the Agreement (defining the word "mail")  under which OptumRx threatened potential disciplinary action against Mission Pharmacy (id. at 9–10); (3) that termination from the pharmacy network will violate the Texas Insurance Code.  (Id. at 10–12.)  This Court will separately evaluate whether Mission Pharmacy is likely to succeed on the merits of each of these three claims.

      1.  <u>Likelihood of Success of Contract Interpretation Claim</u>

The Agreement prohibits fulfillment of prescriptions by mail; Mission Pharmacy does not dispute this.  (Agreement § 3.10; Dkt. # 8 at 8.)  However, since the original Agreement did not define "mail," Mission Pharmacy argues that the definition of "mail" must be restricted to delivery by the United States Postal Service ("U.S. Postal Service"), and that delivery by other, private carriers, such as Federal Express, does not violate the Agreement.  (Dkt. # 8 at 8.)  Mission Pharmacy ships compounded medications via private carriers rather than via the U.S. Postal Service, and contends that termination from the Pharmacy Network constitutes a breach of the Agreement.  (Id. at 8–9.)  Accordingly, resolution of this

argument turns upon the determination that "mail," as stated in the Agreement, is or is not restricted to items delivered by the U.S. Postal Service.

California state law governs interpretation of the Agreement. Pursuant to California law, the parties' intention at the time the agreement was entered into governs contract interpretation.  See Yount v. Acuff Rose-Opryland, 103 F.3d 830, 835–36 (9th Cir. 1996) ("Under California law, a contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.") (quoting Cal. Civ. Code § 1636).  Where there is a dispute as to the meaning of a contract, the Court should look to the words of the contract to determine the intent of the parties at the time the contract was formed.  State v. Cont'l Ins. Co., 55 Cal. 4th 186, 195 (Cal. 2012) ("Such intent is to be inferred, if possible, solely from the written provisions of the contract.") (quoting AIU Ins. Co. v. Superior Ct., 51 Cal. 3d 807, 822 (Cal. 1990)); see also Cal. Civ. Code § 1639.  The Court should use "the clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense."  Santisas v. Goodin, 17 Cal. 4th 599, 608 (Cal. 1998) (quoting Cal. Civ. Code §§ 1638, 1644).  The Court will only "look beyond the terms of the writing where it appears that the parties intended to ascribe a technical or special meaning to the terms used."  Acuff-Rose, 103 F.3d at 836.  Finally, "[a] term is not ambiguous merely because the policies do not define it . . . [n]or is it ambiguous

because of disagreement concerning the meaning of a phrase." Cont'l Ins. Co., 55 Cal.4th at 195 (quoting Castro v. Fireman's Fund Am. Life Ins. Co., 206 Cal. App. 3d 1114, 1120 (Cal. Ct. App. 1988)).  Rather, a term is only "ambiguous when it is capable of two or more constructions, both of which are reasonable." Cont'l Ins. Co., 55 Cal. 4th at 195 (quoting Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1, 18 (Cal. 1995)).

        Mission Pharmacy argues that the clear and explicit meaning of "mail" in the Agreement is restricted to items delivered by the U.S. Postal Service,[1] citing three cases, as well as Webster's 1973 New Collegiate Dictionary, to support this argument.[2]

---

[1] The relevant provision of the contract states: "No Mail Fulfillment or Solicitation. Company and Pharmacy shall not solicit a Member for mail delivery or deliver any Covered Prescription Services to a Member by mail,, [sic] except upon the advance written approval of Administrator, which approval may be refused in Administrator's sole discretion."  (Agreement § 3.10.)

[2] Mission Pharmacy cites Prince v. Poulos, 876 F.2d 30, 32 n.1 (5th Cir. 1989); United States v. Davis, 461 F.2d 83, 87 (5th Cir. 1972); and Cachet Residential Builders, Inc. v. Gemini Ins. Co., 547 F. Supp. 2d 1028, 1030 (D. Ariz. 2007).  The holdings in these cases are not binding here, where the contract is interpreted pursuant to California law.  Even if the holdings in these cases were binding on this court as a general matter, they are inapplicable here, where the word "mail" is used in a different context.

        Prince v. Poulos held that "mail," for purposes of Rule 25(a)(2)(B) of the Federal Rules of Appellate Procedure, does not include deliveries by Federal Express.  However, Rule 25(a) was amended in 1996 to permit delivery by third-party commercial carrier, so long as the commercial carrier can deliver a document within three calendar days.  See Fed. R. App. P. 25(a)(2)(B)(ii).

The parties entered into this agreement in 2012, a time when private

delivery services such as Federal Express and United Parcel Service were

frequently used interchangeably with the U.S. Postal Service.[3]  Further, it appears

that Section 3 of the Agreement serves a variety of purposes, including ensuring

that Member Pharmacies comply with state and federal laws regarding drug safety

---

United States v. Davis upheld a district court's definition of "mail" as "any mail matter or material [that] remains in the custody of the Postal Service." Davis 461 F.2d at 87.  This case interpreted "mail" only in the context of 18 U.S.C.A. § 1708, a criminal statute regarding mail fraud, and never reached the question as to whether delivery by a private carrier service, such as Federal Express, should be defined as mail.

The court in Cachet Residential Builders found that the definition of "mail" as used in Arizona Rule of Civil Procedure 4.2(c), regarding service of process, is restricted to delivery by the United States Postal Service.  The court made this finding based upon the plain language of the rule, which states that "service may be made [upon an out of state party] by depositing the summons and a copy of the pleading being served in the *post office*. . . Upon return through the *post office* of the signed receipt, the serving party shall file an affidavit with the court."  Id. at 1030 (quoting Ariz. R. Civ. P. 4.2(c)) (emphasis added).

This Court could only find one applicable authority to support Plaintiff's proposition that "mail" refers only to the United States Postal Service, rather than private delivery services such as Federal Express.  In Magnunson v. Video Yesteryear, the Ninth Circuit held that delivery by Federal Express did not constitute "mail" for purposes of Federal Rule of Civil Procedure 5.  85 F.3d 1424, 1431 (9th Cr. 1996).  The Magnunson court made this determination because Rule 5 was promulgated in 1937, when "there [wa]s little doubt that 'mail' meant 'U.S. mail'" even though the Court noted that there is "a question of whether the term 'mail' encompasses private delivery services today."  Id. at 1430–31.  The Magnunson Court's reasoning is confined to the interpretation of Rule 5, and is inapplicable here.

[3] Indeed, the Court takes judicial notice of the fact that Federal Express and the U.S. Postal Service have worked together in a service called "SmartPost" where parcels are deposited with Federal Express and then transferred to the U.S. Postal Service for final delivery.

and safeguarding uniform and cost-effective drug distribution.[4] (See Agreement §§ 3.1–3.16.)  Accordingly, it seems the prohibition on mail fulfillment does not exist merely because OptumRx prefers that mail-order drugs be delivered by private carriers, and interpreting "mail" to mean only the U.S. Postal Service seems inconsistent with the purpose of Section 3.  Mission Pharmacy has not made a sufficient showing that the parties' intent at the time of contracting is clear and unambiguous from the words of the contract.[5]  At this time, Mission Pharmacy has not established a likelihood of success on the merits with regards to its contract interpretation claim.

### 2.  Likelihood of Success of Contract Modification Claim

Mission Pharmacy also argues that it is entitled to a preliminary injunction because OptumRx unilaterally amended the definition of "mail" in the Agreement without obtaining Mission Pharmacy's consent or paying

---

[4] Section 3 describes the duties and obligations of OptumRx and the subcontracting Pharmacies, including credentialing requirements, billing specifications, and various accountability measures.  (See Agreement §§ 3.1–3.16.)

[5] Further, no matter how this Court defines mail, Mission Pharmacy is not credentialed with OptumRx as a mail-order pharmacy.  Mission Pharmacy submitted a Recredentialling Application to OptumRx on September 15, 2014 (Dkt. # 8, Ex. C-1), stating that it is not a mail-order pharmacy; Mission Pharmacy does not allege in this application that it meets the necessary credentialing requirements.  (Id. at 5.)

consideration.[6]  (Dkt. # 8 at 9–10; Hall Aff. ¶ 7; Dkt. # 8, Ex. C ¶¶ 15–16.)

Plaintiff states that termination from the Pharmacy Network based upon an invalid

modification amounts to a breach of contract.  (Dkt. # 8 at 10.)

Contrary to Plaintiff's assertions, the California Civil Code does not

require consideration to support the instant contract modification: "[a] contract in

writing may be modified by a contract in writing." Cal. Civ. Code § 1698(a); see

generally Fanucchi & Limi Farms v. United Agri Products, 414 F.3d 1075, 1080–

85 (9th Cir. 2005) (evaluating contract modification pursuant to Cal. Civ. Code

§ 1698).  Consideration is only required to modify a written contract where the

modification is oral.  Cal. Civ. Code § 1698(c).  Here, the Agreement and

modification are written, and OptumRx's modification does not fail for lack of

consideration.

Under California law, unilateral contract modification must be

"consonant with the duty of good faith and fair dealing."  See Badie v. Bank of

America, 67 Cal. App. 4th 779, 798 (Cal. Ct. App. 1998).  "[T]he fact that one

party reserves the implied power to terminate or modify a unilateral contract is not

fatal to its enforcement, if the exercise of power is subject to limitations, such as

---

[6] Plaintiff states that "[u]nder California law, Optum may not unilaterally amend the terms of the Agreement.  In order to alter the terms of a contract, the modifying party must obtain the counter-party's consent, and the change must be supported by additional consideration."  (Dkt. # 8 at 9.)  This misstates California law.  See Cal. Civ. Code § 1698(a) ("[a] contract in writing must be modified by a contract in writing").

fairness and reasonable notice." <u>Beaver v. Tarsadia Hotels</u>, 978 F. Supp. 2d 1124, 1141 (9th Cir. 2013) (quoting <u>Asmus v. Pacific Bell</u>, 23 Cal. 4th 1, 15–16 (Cal. 2000)). The Agreement explicitly defines its scope and provides a modification procedure. The Agreement states that "[a]ny of the rules, policies, administrative procedures and guidelines adopted by Administrator may be distributed in the form of a Pharmacy Manual . . . [which] may change from time to time. Any changes shall be binding on Company and Pharmacy." (Agreement § 3.15.) The Agreement permits OptumRx to modify the Agreement for any reason if it "provid[es] thirty (30) days prior written notice to Company. If Company does not object to such amendment in writing within such thirty (30) day notice period, Company and Pharmacy shall be deemed to have accepted the proposed amendment." (Agreement § 11.2(b).)

OptumRx complied with the contract modification procedures set forth in the Agreement when it defined "mail" in the 2015 Pharmacy Manual. On December 1, 2014, OptumRx sent a notice to CIPN, as well as an email notice to Mission Pharmacy, notifying Member Pharmacies that the 2015 Pharmacy Manual was available online and would take effect January 1, 2015. ("Rendleman Decl.," Dkt. # 15, Ex. A ¶ 15; Dkt. # 15, Ex. A-3.) There are no facts currently before the

Court that would suggest that OptumRx's ability to unilaterally modify the contract is not consonant with the duty of good faith and fair dealing.[7]

Mission Pharmacy does not allege that it objected in writing to the 2015 Pharmacy Manual.  (See Dkt. # 8; Dkt. # 22.)  Rather, Mission Pharmacy states that it first received actual notice of the change when it received the Letter on August 31, 2015, and that it timely objected to this new definition in its September 14, 2015 response, when it stated it would continue sending prescriptions out-of-state via private carriers.  (Dkt. # 8, Ex. C-6; Dkt. # 22 at 3, n.4.)  Importantly, it appears that OptumRx publishes an updated Pharmacy Manual every year.[8]  Mission Pharmacy does not allege that the December 1, 2014 email was not delivered, nor does it allege a factual basis for believing the 2015 Pharmacy Manual would be identical to the 2014 Manual.   Mission Pharmacy does not allege that OptumRx modified the contract in bad faith.  (See Dkt. ## 8, 22, 30.)  This Court therefore finds that Mission Pharmacy has not established a likelihood of success of the merits with regard to the contract modification claim.

---

[7] Indeed, it can be fairly argued that the language at issue here is a clarification and not a modification, as Plaintiff suggests.

[8] In the instant Motion for Preliminary Injunction, Plaintiff submitted both the 2014 and 2015 Pharmacy Manuals as exhibits to the Court.  (Dkt. # 8, Ex. C-2; Dkt. # 8, Ex. C-3.)

3.  <u>Likelihood of Success on Texas Insurance Code Claim</u>

Mission Pharmacy argues that this Court should grant a preliminary injunction prohibiting OptumRx from terminating Mission Pharmacy from its Pharmacy Network, because termination for failure to comply with the Agreement will violate the Texas Insurance Code.  (Dkt. # 8 at 10–12; Dkt. # 22 at 5–7; Dkt. # 30 at 1–2.)  Liberally construed, Plaintiff asserts three theories to support this argument: (1) terminating Mission Pharmacy for mailing prescriptions without the proper accreditation violates the Texas Insurance Code; (2) failure to terminate pharmacies that do not meet the accreditation requirements but nonetheless mail prescriptions within the state of Texas creates an inconsistent policy which violates the Texas Insurance Code; (3) utilizing the no-fault termination clause to eliminate the intermediary (CIPN) currently administering the agreement violates the Texas Insurance Code.  Each of these arguments will be analyzed below.

The relevant provision of the Texas Insurance Code states the following:

> A health insurance policy or managed care plan that is delivered, issued for delivery, or renewed or for which a contract or other agreement is executed may not . . . deny a pharmacy or pharmacist the right to participate as a contract provider under the policy or plan **if the pharmacy or pharmacist agrees to provide pharmaceutical services that meet all terms and requirements and to include the same administrative, financial, and professional conditions that apply to pharmacies and pharmacists who have been designated as providers under the policy or plan.**

Tex. Ins. Code Art. 21.52B § 2(a)(2) (emphasis added). This rarely litigated

provision only prohibits the termination of pharmacies in compliance with the

administrative, financial, and professional requirements contained in the agreement

between the network and the pharmacy.[9] The provision further permits a plan to

"establish[ ] reasonable application and recertification fees for a pharmacy . . .

provided that such fees are uniformly charged to each pharmacy under contract to

the plan." Id. § 2(c)(3).

    a. Texas Insurance Code and the Prohibition of Unaccredited Mailing

        Plaintiff alleges that terminating Mission Pharmacy for mailing

prescriptions without the proper accreditation violates the Texas Insurance Code.

(Dkt. # 22 at 6–7.) OptumRx does not have a blanket prohibition on mail-order

---

[9] The case law Plaintiffs cite is distinguishable from the present facts. Plaintiffs cite Tex. Pharmacy Ass'n v. Prudential Ins. Co. of Am., a case where a pharmacy benefit provider was prohibited under the Texas Insurance Code from denying otherwise compliant pharmacies admission to its network merely because it had contracted with a sufficient number of pharmacies in a particular geographic area. 907 F.Supp. 1019, 1024 (W.D. Tex. Oct. 24, 1995). The language of the case does not support the proposition that a pharmacy benefit provider is required to contract with pharmacies that are not compliant with its administrative, financial, and professional conditions.

        Plaintiffs also cite to Kentucky Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329, 332 (2003). This case dealt with preemption in the state of Kentucky rather than Texas, and held that Kentucky's "any willing provider" statutes are laws regulating insurance, and therefore not preempted by ERISA. Neither the holding nor the reasoning in this case has any bearing as to whether Defendants would violate the Texas Insurance Code by terminating Plaintiffs from their network.

pharmacies.  Rather, OptumRx permits Member Pharmacies to send prescriptions

out-of-state if the pharmacy secures additional accreditation.  Both the 2014 and

2015 Pharmacy Manuals Plaintiff submitted to the Court state that "[a]ny

Pharmacy requesting mail order pharmacy network access must be certified with

Verified Internet Pharmacy Practice Sites (FPPS) and accredited by URAC,

formerly known as Utilization Review Accreditation Commission, for the

applicable accreditation."  (Dkt. # 8, Ex. C-2 at 57; Ex. C-3 at 86; see also Dkt.

# 15 at 3, n. 1 & n. 2.)  OptumRx states that these requirements "provide OptumRx

with assurance that a pharmacy in its mail network has the appropriate controls and

processes in place to safely and effectively dispense medications by mail."  (Dkt.

# 15 at 3–4; Dkt. # 8, Ex. C-2 at 57.)

          Mission Pharmacy argues that OptumRx's accreditation requirements

for pharmacies shipping prescription medications across state lines violate the

Texas Insurance Code because these requirements "[are] not a financial condition .

. .  a professional condition[ ] or . . . an administrative condition."  (Dkt. # 8 at 11.)

Mission Pharmacy does not further explain this argument.  OptumRx explains that

the additional accreditation requirements are in place to "assur[e] that a pharmacy

in its mail network has the appropriate controls and processes in place to safely and

effectively dispense medications by mail."  (Dkt. # 15 at 4.)  To date, no Texas

case has defined the parameters of "financial," "professional," or "administrative"

conditions.[10]  OptumRx has expressed concern about special handling

requirements for certain medications, as well as the difficulty of verifying the

identity of the person receiving the medication when medications are sent via mail.

(Id. at 3; Rendleman Decl. ¶ 6.)  Such concerns, insofar as they protect the integrity

of the delivered medication and the safety of the patient receiving it, could be

considered a professional condition.

             Mission Pharmacy has not followed the procedures to mail

prescriptions out-of-state via any form of mailing service.  (Dkt. # 8, Ex. C-1; Dkt.

# 22.)   Mission Pharmacy does not argue that the third-party accreditation process

itself is unreasonable, that the fees charged pursuant to the third-party accreditation

process are unreasonable, or that the fees are charged in a manner that is not

uniform.  If the prohibition on mailing is a professional condition, Mission

Pharmacy's noncompliance excuses OptumRx from contracting with Mission

Pharmacy.[11]

---

[10] This court could not find a case, and Plaintiff does not cite to a case, stating either that a pharmacy network's accreditation requirements were unreasonable, or that a pharmacy network's termination of a pharmacy for failure to comply with the plan's administrative, financial, or professional requirements violated the Texas Insurance Code.

[11] Mission Pharmacy also argues that the Texas Insurance Code is violated because some pharmacies in the OptumRx network, including OptumRx itself, are permitted to operate mail order pharmacies.  (Dkt. # 8 at 11; Dkt. # 22 at 7.)
        Plaintiff does not adequately support this claim, because it does not allege that the pharmacies permitted to mail prescriptions out-of-state do not

b. <u>Texas Insurance Code and Alleged Inconsistencies in the Prohibition on Mailing</u>

Mission Pharmacy argues that the prohibition on mailing prescriptions out-of-state is invalid, because OptumRx does not threaten to terminate pharmacies from the OptumRx network for mailing prescriptions within the state of Texas. (Dkt. # 30 at 1–2.)  Plaintiff states that this alleged inconsistency between intrastate and out-of-state mailing requirements violates the Texas Insurance Code.  (<u>Id.</u>)  OptumRx explained that it is difficult to monitor whether a pharmacy is dispensing medications by mail to patients located in Texas, because "a member may be commuting for work to a nearby town and have prescriptions filled where she works, a member could have relocated within the state, or a member may have required an unexpected prescription while traveling."  (Rendleman Decl. ¶ 10.)  This concession does not negate OptumRx's blanket requirement that pharmacies wishing to mail prescriptions to patients must meet accreditation requirements.  Mission Pharmacy does not allege that OptumRx has terminated any pharmacy,

---

comply with OptumRx's accreditation requirements.  Plaintiff's pleadings explicitly refer to only one other pharmacy, RXPress Pharmacy ("RXPress"), located in Fort Worth, Texas.  (Dkt. # 8, Exs. A & B.)  RXPress was notified that it would be terminated for mailing prescriptions out-of-state if it remained noncompliant, and was actually terminated for this reason.  (Dkt. # 8, Ex. B ¶ 19; Dkt. # 8, Ex. B-1.)  OptumRx later "rescinded the termination because RXpress agreed to take corrective action to prevent dispensing medications by mail, including delivery by common carrier, to out-of-state members."  (Rendleman Decl. ¶ 20.)

*including Mission Pharmacy*, for mailing prescriptions intrastate without accreditation. Accordingly, this alleged inconsistency between intrastate and out-of-state mailing requirements is not arbitrary, and does not cause OptumRx's credentialing policy to violate the Texas Insurance Code. Mission Pharmacy has not established a likelihood of success on the merits of its second Texas Insurance Code Claim.

  c. <u>Texas Insurance Code and the No-Fault Termination</u>

   Plaintiff's Amended Complaint alleges that OptumRx's proposed no-fault termination pursuant to the June 2, 2015 letter violates the Texas Insurance Code. (Am. Compl. ¶¶ 37, 39(c).) Mission Pharmacy supports this argument only by stating that the Texas Insurance Code "expressly prohibits excluding pharmacy providers like Optum for reasons other than a failure to satisfy conditions generally applicable to all pharmacies within a single plan or policy." (Dkt. # 30 at 1–2.)

   As explained above, no case has yet defined the parameters of "financial," "professional," or "administrative" conditions contained in Article 21.52B of the Texas Insurance Code. Nonetheless, restructuring a business operations model to eliminate an intermediary and allow a pharmacy benefit plan to contract directly with member pharmacies could be considered either a financial or administrative action. OptumRx notified each pharmacy presently contracting

through CIPN that it could avoid any disruption in service by contracting directly with OptumRx, and provided instructions for doing so.[12]  (Dkt. # 8, Ex. C-4.)

Further, Mission Pharmacy does not provide this Court with evidence that any other pharmacy originally contracting through CIPN will, after December 31, 2015, continue to contract through CIPN, or be permitted to contract directly with OptumRx without first executing the OptumRx Credentialing Application and Pharmacy Network Agreements described in the June 2, 2015 letter.  (See Dkt. # 8, Ex. C-4.)  Additionally, the cases Plaintiff cites in support of this claim are not persuasive as to this issue.[13]  Accordingly, this Court finds that Mission Pharmacy

---

[12] Pharmacies wishing to contract directly with OptumRx were instructed to submit a fully executed Credentialing Application and Pharmacy Network Agreement to OptumRx by November 1, 2015.  (Dkt. # 8, Ex. C-4.)

[13] Plaintiff cites three out-of-district cases supporting its argument that District Courts have issued injunctions preventing imminent termination from pharmacy networks.  (Dkt. # 30 at 5.)  Even if the decisions in these cases were binding on this Court, the facts of the cases are distinguishable from the facts here.

In Paduano v. Express Scripts Inc., the District Court for the Eastern District of New York extended a Temporary Restraining Order ("TRO") beyond its original 14-day TRO, to prevent multiple pharmacy benefit providers from terminating a pharmacy pending the determination that the pharmacy's claims were or were not subject to various arbitration provisions.  No. 2:14-cv-05376-ADS-ARL (E.D.N.Y. Oct. 3, 2014).  Notably, the Paduano litigation was brought as an anti-trust action, a circumstance entirely different from that at issue here.  Id. at *2.  Further, the court did not issue a preliminary injunction, nor did it address the merits of the claims as would be necessary for the grant of a preliminary injunction; the court discussed only the portions of Federal Rule 65 relevant to the issuance and extension of a TRO where arbitration was potentially pending.  Id. at 56.  Accordingly, this case is not instructive to the Court.

has not established a likelihood of success on the merits of its Texas Insurance

Code Claim.

### 4. Conclusion

      The court finds, for the reasons stated above, that Mission Pharmacy

has not shown it is likely to succeed on the merits of any of its claims against

---

      In <u>Vision Service Plan Insurance</u>, Vision Service Plan ("VSP") was enjoined from terminating a chain of optometry practices from its network solely because the optometry chain's business practices did "not comport with VSP's preferred business model."  <u>Dr. Mark Lynn & Assocs. PLLC v. Vision Serv. Plan Ins. Co.</u>, No. Civ.A.3:05CV-548-S, 2005 WL 2739160, at *1 (W.D. Ky. Oct. 21, 2005).  The District Court's injunction was issued pursuant to Kentucky's "Any Willing Provider" statute, which only allows insurance companies to terminate contracting healthcare providers for failure to comply with "relevant, objective standards . . . *reasonably related to services provided*."  <u>Id.</u> at *2 (quoting Ky. Rev. Stat. § 304.17C-020 & 050) (emphasis added).  This case is readily distinguishable.  First, OptumRx is not terminating Mission Pharmacy for failure to utilize a preferred business model.  Rather, OptumRx changed its own business model, and informed Mission Pharmacy of the steps it could take to contract with OptumRx pursuant to this new model.  (Dkt. # 8, Ex. C-4.)  Second, the Texas Insurance Code, unlike the Kentucky "Any Willing Provider" statute, has more permissive standards, and does not require "financial," "professional," or "administrative" conditions to be "reasonably related to services," as does the Kentucky statute.

      Finally, Plaintiff cites <u>United HealthCare</u>, a case where the District Court for the District of Minnesota temporarily enjoined a defendant prescription drug company from issuing prescription discount cards to AARP members using information gained during a then-terminated relationship with the AARP.  <u>United HealthCare Ins. Co. v. AdvancePCS</u>, No. CIV.01-2320, 2002 WL 432068 at *19 (D. Minn. March 18, 2002) (aff'd <u>United HealthCare Ins. Co.; AARP v. AdvancePCS</u>, 316 F.3d 737 (8th Cir. 2002)).  The court found that the plaintiff in the case was likely to prevail on the success of the merits as to certain violations of the Minnesota Deceptive Trade Practices Act ("MDTPA"), and violation of a Minnesota statute providing a civil penalty against entities whose conduct prohibited by the MDTPA targets senior citizens.  <u>Id.</u>

OptumRx.  Having found that Mission Pharmacy has not carried its burden of showing that it has a substantial likelihood of success on the merits, the Court need not reach the final three requirements for granting a preliminary injunction.

CONCLUSION

For the foregoing reasons, the Court **DENIES** Mission Specialty's Motion for Preliminary Injunction.

**IT IS SO ORDERED**

**DATED:** San Antonio, Texas, December 30, 2015.

David Alan Ezra
Senior United States Distict Judge